Thank you to both counsel. Thank you. Our next case this morning. I think we're waiting on up. We've got our counsel. So we're now going to hear Smart Oil versus DW Mazel and we have Mr. Lugace. Have I pronounced your name correctly? It's actually Lugace, but 50% of the people I need say Lugace. So that's fine. Mr. Lugace, you may begin. Thank you, Your Honor. Good morning. My name is Kevin Lugace. I represent the defendant appellant in this case, which is DW Mazel and we're here today on appeal to ask this court to reverse the district court with respect to its summary judgment ruling against DW Mazel and in favor of Smart Oil. This case is essentially a case involving claims for breach of contract and as well for fraudulent inducement, which were asserted by my client on counterclaims against the plaintiff Smart Oil. Smart Oil in turn asserted a breach of contract claim against DW Mazel. And in effect, what we're dealing with here today is a contract that was entered into in 2014 between the parties that dealt with 30 gas stations in Illinois that DW Mazel wanted to purchase for 67 million dollars and Smart Oil was essentially the seller under the contract and DW Mazel was the buyer. And the parties went into this contract. This was actually the second contract that the parties had gone into for this type of transaction and the parties went into this contract where one of the key issues was whether or not Smart Oil could bring the 30 gas stations that it was supposedly selling to the table to sell them to DW Mazel. And in fact, the agreement itself contains within it, and this is in our briefs, provisions relating to the authority that Smart Oil had to convey to sell these properties to DW Mazel. And of note and the critical issue here, at least for us, is what Smart Oil represented when it went into this contract because what Smart Oil is seeking in this case is essentially liquidated damages. They're saying that DW Mazel breached the agreement and that entitled them to liquidated damages. And our defenses in the case are essentially that, whoa, hold on slow down a second here. What's really going on is that you couldn't bring to the table. You couldn't bring all 30 gas stations. You couldn't convey to us, sell to us what you were claiming that you had to sell. And so you're the one that actually breached the agreement and basically that negated the contract at that point in time. Under the agreement, and this is one of the critical sections in paragraph 15, Smart Oil essentially represented that it had the authority to enter into all of the documents to be able to convey the property. And what the parties did is they essentially made those representations by Smart Oil conditions precedent based on the truthfulness and the Smart Oil would have the ability to convey the properties. And the reason why this was done is because you had an earlier agreement back in June 2014, where the parties were trying to do the same type of deal, but with less properties and Smart Oil couldn't bring all of those properties to the table to be able to sell them to DW Mazel. And in fact, Smart Oil ultimately ended up terminating the agreement because of that. And so going into the second agreement, DW Mazel had concerns and what we see is that Smart Oil's owner, a gentleman named Syed, verbally represented going into the agreement. I've got the authority. I can sell all 30 properties. And then that was again embraced in writing in the contract itself. And one of the things we cited. Referencing that 15A1 and I'm at page 11 of the of the contract, that language that you're referring to, seller has the legal power right and authority to enter into this agreement and the instruments referenced in this agreement. That same initial sentence also is present in 15B, right? In consideration of seller into the agreement. Strike that. 15B1. Buyer has the legal power right and authority to enter into this agreement and the instruments referenced in this agreement and consummate the transaction contemplated hereby. It strikes me that language, you know, the argument here is you're attempting to stretch that language to include particulars. If we were to interpret it that way, wouldn't we run into difficulty in a similar interpretation of 15B1? There's been no issue raised in this case, Your Honor, about DW Mazel's ability to consummate the deal. Essentially what we're raising as our defense is that they did not have the authority to convey the properties and that was in the agreement. There's been no argument by Smart Oil in this case that DW Mazel didn't have the ability. What they were basically saying is that their breach of contract relates to us paying the deposit and going forward with the agreement itself. So I don't think that the argument we're making is seeking to encapsulate 15B as well. Again, the defense that we're specifically raising here relates to the authority that they had to sell the properties and it's clear based on the evidence that's been produced in this case by Smart Oil itself that they only produced two fully executed contracts covering a total of four of the properties and they also went out and got 13 affidavits which covered essentially at least 21 of the properties, although there were problems with those affidavits. So even from an evidentiary perspective in terms of what authority they had to consummate the deal, they couldn't even show that during discovery in this case or on summary judgment. And in fact, some of the affidavits that they produced relating to the properties here had significant problems with them. There was an affidavit from a gentleman named Mir Akbar where he claimed that he was the owner of a property and in fact an unsigned contract produced had different companies as the owners of the property. There was also a contract from a gentleman named Kareem Chaturwala which said that he had an executed contract as of the closing in December 2014 and emails that we've referenced in our brief based in from January 2015 show that he didn't have a signed contract as of that time. And in fact, the contract produced by Smart Oil was unexecuted. And so the evidence that Smart Oil itself produced to substantiate its own authority essentially show that it didn't have the ability to sell all 30 contracts either in November 2nd, 2014 when the parties executed the agreement and Smart Oil made the representations about its authority and ability to consummate the deal or at any time thereafter. Mr. Lucia, can you address the liquidated damages versus penalty provision issue? Sure. So our argument here is essentially twofold. The first argument we're making is essentially that the language of the liquidated damages provision itself essentially penalizes you for any type of breach and that it specifically states that if there are defaults in the performance of any term, covenant, condition or obligation under this agreement, including the obligation of buying the property, it goes on to say that the seller would be entitled to liquidated damages. And it's our argument essentially that any type of breach in this case would essentially amount to the seller, Smart Oil, saying that they're entitled to liquidated damages and at least under the Lake decision and I believe under GK development, the courts have said that's too much. That's going to be a penalty. If you're going to basically say that you have a right to liquidated damages when the breach is small, medium or large, that's not acceptable. That essentially contravenes public policy in terms of the enforcement of these provisions and we're not going to allow that. In this kind of situation where you're talking about money that was paid down as a deposit as part of the due diligence, what would the damages be? So for this to be a penalty, I'm trying to imagine in my mind, okay, well, if it was a breach, how might the amount of damages vary? You know, the earnest money, it's, well, you see the point I'm making. So sure. Yeah, and this goes to the second part of what we're saying is when the owner Syed of Smart Oil was deposed, he essentially said that there was no effort to approximate his damages with respect to this deal back at the time that the parties were putting together the deal, that he wasn't going to incur any actual damages because he was essentially using DWM's money to fund the deal. And so this was basically our second argument here is that one of the factors you look at to determine whether or not that this is going to be a penalty or it's going to be an enforceable liquidated damages provision is whether or not there was any effort to approximate damages. I mean, even if you can't figure out what your actual damages are going to be, the parties under the law are still required to try to make an approximation. And then here what we have is we essentially have Syed basically saying during this deposition that he took $25,000. He just arbitrarily took that number and apply property to come up with the $750,000. It wasn't an effort to approximate his damages based on what he might incur going through with the deal. And the reason ultimately was because he wasn't using his own money. So in addition to the 30 contracts that Syed was unable to bring to the table as part of the transaction, it's also that he did not bring the titles as well. Under paragraph 5 of the agreement, he had an obligation to get title commitments to turn them over to DWM and then that would trigger a five-day review period for DWM. And in fact, it is undisputed here that he did not produce those to DWM. Instead, what he did is he says that he gave them to his attorney. Now the title commitments, we're not talking about the titles that are transferred when the deal was closed, but the title commitments themselves, if they were with his attorney, they were never produced in this case. There was no affidavit to substantiate that other than Syed's testimony, but it's clear, he doesn't dispute that he did not give them to DWM as a requirement under the agreement. So your rebuttal time, and you can feel free to keep using it if you want, but I just wanted to highlight for you, you had wanted to say five minutes for rebuttal. Oh, okay. Your clock is ticking. So it's up to you. I will go on just a little bit longer and save the remainder. I apologize. No, that's fine. I tend to talk a little bit long. So, I mean, there are two things that went on here with respect to Smart Oil in terms of its inability to consummate the deal, and that was the 30 contracts and the titles. And in fact, that amounted to a breach and it amounted to a failure of its own inability to satisfy certain conditions precedent, which under the liquidated damages provision, it needed to be able to satisfy. So we have a company that's essentially coming and saying that even though they breached and they couldn't fulfill their own obligations under the agreement, that they are still entitled to liquidated damages. And our contention here is that this certainly contravenes public policy. When you have a company that has no actual damages, didn't approximate those damages, was in breach of an agreement, and then is seeking liquidated damages, that is a moment where we should not be enforcing these type of provisions. So I'll reserve the rest of my time for rebuttal. Thank you, Mr. Lugashe. Mr. Crane. Thank you, Your Honors. Counsel may please the court. I'm Jeffrey Crane. I'm counsel for the plaintiff, Appali, in the case Smart Oil LLC. And we're here after the district court has granted summary judgment in favor of my client, Smart Oil LLC, on its sole claim for breach of contract against DW Maisel. And the court knows the contracted issue is a purchase and sale agreement from November of 2014. And in particular, the focus of the contract is particularly the earnest money deposit and liquidated damages provisions. The agreement obligated DW Maisel to pay an initial deposit of $300,000. In November, in this agreement, DW Maisel had represented that it had already deposited $250,000 with the initial escrow holder, which is identified in the agreement as Jeffrey B. Zwick. That's a lawyer in Brooklyn, New York, who in fact turns out represented DW Maisel or its principals in other matters. Which was only learned through discovery. DW Maisel was required to admit the balance of the $50,000 of the initial deposit to Zwick. And then DW Maisel was required to fully fund the deposit of $300,000 within three days of the effective date of the agreement, which was November 2nd of 2014. So on what happens on November 3rd of 2014, Mr. Zwick, the initial escrow holder, sent an email stating that, quote, this shall confirm that as of today, I am holding $300,000 for DW Maisel LLC in connection with its proposed purchase of a portfolio of 30 gas stations located throughout Illinois from Smart LLC. And the money shall be held in accordance with the purchase and sale agreement executed on November 2, 2014. Close quote. I'll refer to that email as the Zwick email for ease of reference. So this Zwick email was addressed to David Ibrahim Zada, who's the principal of DW Maisel, one of his business colleagues, a person named Wolf Berger, and DW Maisel's lawyer, Adam Kalish. And then on that same day, on November 3rd of 2014, Mr. Ibrahim Zada forwarded the Zwick email to Mr. Syed of Smart Oil. At no point did DW Maisel inform Smart Oil that DW Maisel had not in accordance with the $300,000 Zwick, as was required under the agreement. Rather, DW Maisel concealed this information that it failed to make the initial deposit to Zwick. And, you know, as counsel referred to, there was a prior agreement in June of 2014 in which Mr. or DW Maisel had transferred a $250,000 deposit to Zwick, which was confirmed in June of 2014. But unbeknownst to Smart Oil, until discovery in this lawsuit, Zwick returned those funds in July of 2014. Moving back to the agreement, the November agreement, it had a due diligence period, which you didn't hear anything about in opposing counsel's presentation. The due diligence period closed on November 30th of 2014. The agreement required DW Maisel to provide written notice of disapproval of due diligence by no later than November 30, 2014. That simply never happened. The agreement provides that, and the district court found that DW Maisel approved the due diligence. Are we still connected? Yes. The district court correctly concluded that, quote, the extent to which certain due diligence materials were or were not handed over to DW Maisel is beside the point, close quote. And the district court decided that, quote, DW Maisel cannot now sidestep its obligation by arguing ex post facto that certain due diligence requirements were not met, close quote. The district court was referring to DW Maisel's obligation to pay the earnest money deposit. Now, both in the written briefs and in the argument this morning, DW Maisel devotes a significant portion of their arguments on this appeal on these due diligence materials by basically deceptively and selectively citing certain parts of the record while ignoring other record evidence and ignoring the language of the agreement itself. And then the district court's findings based on this review of those matters. In any event, Smart Oil provided to DW Maisel the profit loss statements, invoices, tax reports, and surveys for the properties. As to title commitments, which was raised in argument for each and every property, Smart Oil was prepared to deliver title to the subject properties to DW Maisel at the closing, which was scheduled by the contract on December 10th of 2014. That's why DW Maisel never provided written notice of disapproval of due diligence during June, during, excuse me, November of 2014. At the close of this due diligence period, Mr. Zwick was supposed to transfer the initial deposit $300,000 to a title escrow holder. And additionally, DW Maisel was required at that point in time to make an additional deposit of $450,000 and provide that to the title escrow holder. DW Maisel has admitted that it never sent the initial deposit or the additional deposit to the title company. Here's where I'm going to quote the agreement, Your Honors. It quotes, except as otherwise provided, excuse me, except as otherwise specifically provided in this agreement, the earnest money deposit, defined as the deposit and the initial deposit and the additional deposit, and all the crude interest thereon, shall become non-refundable to buyer at the end of due diligence period, subject to other conditions precedent for the benefit of all part of the parties as set forth under this agreement, and shall be or in the event of buyer's default under this agreement, shall be paid to seller, close quote. Mr. Crane, which paragraph were you reading from in the agreement? That is on page two of the agreement. I'll get the paragraph reference for you. Is it under the heading deposit? Correct. Correct, Your Honor. Thank you. You may continue. Thank you. So, based on that, the district court found that, quote, by failing to pay smart oil, the earnest money deposit, DW Maisel breached the November agreement as a matter of law, close quote. Now, we move to the remedies provision of the November agreement, which clearly identifies sellers pre-closing remedies for buyer's breach, and I want to emphasize pre-closing, because much of what DW Maisel argued in their briefs and what you heard this morning from counsel relates to a potential eventual closing of the transaction, not the pre-closing period. And they particularly want to avoid the pre-closing period because they have no response to their failure to provide written notice of rejection or disapproval of the due diligence. And as to the remedies provision, that section of the agreement provides a quote, if buyer defaults in its performance of any term, covenant, condition, or obligation under this agreement, including the obligation of buyer to purchase the property, if all conditions precedent to such obligation has been satisfied, seller shall receive the entire earnest money deposit and all accrued interest thereon as complete liquidated damages, close quote. Now, what's interesting about that particular provision of the agreement, if your honors have reviewed that portion, in that portion, DW Maisel consented and agreed to that provision and signed right below as almost a separate agreement within the agreement. On that score, the district court found that, quote, to enforce the transfer of the earnest money deposit, however, Smart Oil did not have as great a burden. Smart Oil's right to enforce the earnest money deposit was dependent on DW Maisel's right to conduct the due diligence investigations and notify Smart Oil of its disapproval therefrom. Which DW Maisel did not do. DW Maisel's failure to exercise that right rendered it obligated to pay the earnest money deposit in full, regardless of whether of all conditions precedent were met to DW Maisel's satisfaction, and the parties ultimately consummated the agreement. Thus, in our view, the district court correctly held, based on a careful and thorough review of the record, that Smart Oil is entitled to $750,000 for the earnest money deposit. And we would ask that this court affirm that holding. The court additionally awarded interest in the amount of $169,000. Can I just want to make sure that you get to this before your time lapses? Can you address the liquidated damages versus penalty point? Certainly, Your Honor. So as to the argument that they're making that this liquidated damages provision should be determined in an unenforceable penalty, the district First, the district court held that the liquidated damages clause, as you know, is valid and enforceable under Illinois laws. Under Illinois law. So what is Illinois law that applies? It's primarily what we rely on. It's articulated well in the Morris versus Flory's opinion, where it's set forth a test, a three-part test. And in that case, quote, courts will generally enforce a liquidated damages provision in a real estate contract where it can be shown, one, the parties intended to establish an agreed-upon amount of damages in the event of a case, two, that the amount of the amount provided as liquidated damage was reasonable at the time of contracting and bear some relation to the actual damages, which might be sustained, and three, that the actual damages would be difficult to prove an uncertain amount. Close quote. That's from the Morris versus Flory opinion. Yeah. We provided additional case law under Illinois law, which I won't go through right now, but it's in the briefs. So as to the first prong, the court, the district court found that the amount of liquidated damages provided in the agreement was abundantly clear. I could quote the district court. It's quote, both parties intended to agree upon an amount for damages in the case of a breach. Well, I agree with you on that, Mr. Crane. I think the factor that's a closer call for you is whether the damages amount bears a sufficient relation to the actual damages to be sustained. Okay. Well, as to, as to that portion, your honor, the amount of liquidated damages, you look at the time of contracting, and again, that's under Morris versus Flory's and other Illinois law, and liquidated damages clause in this agreement was reasonable at the time of contracting. That's based on well-settled Illinois law that has found liquidated damages, for example, 10%, 15% and 20% of the purchase price of real estate were reasonable. You could look to the... That goes to the reasonableness of the amount, not to the relationship to any actual damages. Suffered. Okay. And the amount doesn't, if the amount doesn't vary, no matter what happens, then under Morris versus Flory's, it seems more like a penalty. Well, but in terms of, you're looking at the amount at the time of contracting, okay? And at the time of contracting, there was no ability to forecast or predict the amount of actual damages. And in fact, there's case laws cited in our briefs, Your Honor, that speak to that point, that you don't look at the actual damages, that the, you know... And it's supposed to bear some relationship to the actual damages, however. I mean, yes, if the actual damages would be too uncertain and difficult to predict, then you're right. That factor doesn't, that factor doesn't apply. But why would the actual damages be uncertain and difficult to predict here? And, you know, is there any relationship between the actual damages and the penalty for liquidated damages provision? Well, first, Your Honor, I would say that we've said in the Illinois Supreme Court and court of appeals cases that upheld liquidated damages were parties agreed as to reasonable predetermined or not without regard to actual damages. That's the Karimi case, the Weiss versus United States Fidelity case. That's another... But I understand that liquidated damages, I mean, that just tells me that liquidated damages are permissible under Illinois law. But there's that caveat, right? They're permissible so long as they don't function as a penalty clause. So what I'm asking you is to explain to me why it's not a penalty clause. Well, so, you know, in terms of the ability to ascertain damages, you're talking about a contract for the sale of 30 properties and figuring out how to calculate damages on the failure to go through the 67 million dollar transaction as to all those properties and what damages could have been at the time of contracting could have resulted as a result of not consummating or, you know, winding up with a busted transaction where the amount of damages you would have to calculate for all those different properties and all the different possibilities of permutations, you know, that's why I believe the district court correctly held here that ascertaining the damages would be difficult and there wouldn't really be a methodology to do that again at the time of contracting, which is the operative time. Mr. Crane, one question concerning attorney's fees. Yes, paragraph 22 of the agreement talks about legal fees and it says and I note on page 37 of your brief, you're seeking additional attorney's fees and costs incurred in connection with DWM's appeals. The paragraph 22 says the prevailing party shall be entitled to recover from the other party all costs and expenses of suit including reasonable attorney's fees and then it goes on to define a series of certain circumstances, none of which seem to include appeal. It does include post judgment motions, but is it your position that this paragraph 22 provides for you up for smart oil to recover its attorney's fees with regard to this appeal? Yes, your honor. I mean you correctly note in that paragraph. It does say that it shall include without limitation. So and it did provide examples which you're correct. It doesn't list an appeal as one of the items there. But yes, our position is that we are entitled to recover attorney's fees relating to this appeal under that provision of the agreement. You're hanging on that without limitation language. Yes. All right. Thank you. Thank you. Thank you, your honors. Yes. Thank you. Mr. Crane. I see my time is up. Yes. Mr. Lugas say you have a little bit of time left for a bottle. Thank you, your honor with respect to the Zwick email. I think the main question that needs to be asked is whether or not Syed smart oil actually knew that the money had not been paid. There's a lot being thrown around about DWM hiding the fact that the money had not been paid. In fact, we cited a lot of evidence in our brief that shows that smart oil that Syed knew that the money had not been paid including January 2015 emails where Syed is trying to renegotiate the deal to make the deposit non-refundable. And in fact, there's no evidence in this case that there was an escrow account ever set up even though the contract provided for two escrow accounts. There's no evidence that Syed ever contacted the first escrow holders wick about anything including transferring the money that he was supposed to hold to the second escrow account. There's simply no evidence to show that excuse me. The evidence clearly shows that Syed knew about that the payment had not been made and there's a testimony from both Zwick and both DWM that this was a draft email. And so as to the email itself Syed clearly knew the evidence shows that that the money had not been paid as to the district courts ruling you did not hear from counsel and there's nowhere in their briefs. Have they essentially been able to rebut the fact that they could not produce sufficient affidavits or documentary evidence to show that they can convey all 30 properties. And in fact, they made statements in their brief that they had affidavits for all the property owners, but the evidence that they produce in this case clearly falls well short of that. And so as to the district courts ruling on at least two occasions the district courts strangely said that Smart Oil had authority for all 30 properties, but that clearly couldn't have been based on the documentary evidence in the case because there aren't enough contracts to cover all the properties. They only cover four of the properties and there aren't enough affidavits to cover all 30 properties. They only cover 21 of the properties. So the district courts ruling whether it misunderstood the evidence or something else clearly doesn't match up with the statements that it made to justify the ruling that it issued on the last point. I agree with the court that ultimately if the liquidated damages number is not going to fluctuate at all, then it definitely is suspect under Morse. And in fact, you did not hear from counsel and there's nowhere in the briefs how they're explaining basically where the liquidated damages would come from, what their actual damages would be. And the reason again is because of the way this deal was structured. All of the other cases you're dealing with an actual property owner. Here smart oil was essentially a reseller. They weren't using their own money and they didn't own the property so they wouldn't incur any damages. Thank you, your honors. Thank you counsel cases taken under advisement.